Plaintiffs, James and Martha Cabaniss, appeal from an order granting (1) defendants' oral motion for an involuntary dismissal of plaintiffs' complaint for failure to prosecute, and (2) defendants' motion for summary judgment. We reverse and remand.
Plaintiffs filed their complaint in Jefferson Circuit Court on April 5, 1984, alleging that on April 6, 1983, plaintiff James Cabaniss suffered a severe injury to his back while removing large chunks of wood or logs from a beltline or conveyor system in the woodroom of his employer, Weyerhaeuser Company, located in Millport, Alabama. Named as defendants were the following parties, in addition to 27 fictitious parties: Crawford Company, Ken Wilson, Jerry Burkhalter, William Wilson, Steve Sery, Jud Farmer, John Pinkston, Donny Babb, Ravis Ayers, and Morris Bryant. With the exception of Crawford Company, all of these named defendants were supervisory employees or officers of Weyerhaeuser Company.
Plaintiffs' complaint contained two counts. The first count alleged that Crawford Company negligently or wantonly performed safety inspections for Weyerhaeuser. As to the othernamed defendants, plaintiffs alleged that they negligently or wantonly breached their duty to provide plaintiff James Cabaniss a safe place to work, or a reasonably safe work environment, and that they negligently or wantonly controlled the conditions, methods, or *Page 1179 
manner in which work was performed at the time and place of the occurrence made the basis of plaintiffs' complaint. In this first count, plaintiffs further stated against the fictitious defendants any and all claims in negligence, wantonness, breach of contract, and breach of warranty, and any claims arising under the Alabama Extended Manufacturer's Liability Doctrine. Plaintiff's second count claimed damages for Mrs. Cabaniss's mental and emotional distress as well as her loss of consortium.
The following chronology sets forth the pertinent actions taken subsequent to the filing of plaintiffs' complaint: On July 5, 1984, defendant Crawford Company filed its motion for summary judgment. Based on some of the arguments advanced below, apparently this motion was granted, although an order to that effect does not appear in the record before this Court, nor is there anything else contained in the record indicating the date on which the motion was granted. In their statement of the case below, plaintiffs do not indicate that the motion was granted; however, without citing to the record, defendants state in their brief that the motion was granted August 1, 1984, despite the fact that the record indicates that the motion was scheduled for hearing on August 2, 1984. In any event, plaintiffs do not appeal from the order granting summary judgment in favor of Crawford Company.
On July 19, 1984, defendant Donny Babb was dismissed as a party defendant for failure of service of process. On July 31, 1984, pursuant to Rule 4.1(c), A.R.Civ.P., plaintiffs filed an alias summons and complaint, which were served on Babb. On August 29, 1984, Babb responded by filing another motion to dismiss, attaching thereto his affidavit stating, in effect, that his employment at Weyerhaeuser had terminated as of May 1, 1982, approximately eleven months prior to James Cabaniss's injury. In his motion, Babb therefore contended that plaintiffs' claim against him was barred by the applicable statute of limitations of one year found at Code of 1975, §6-2-39. On September 6, 1984, the trial court denied Babb's motion to dismiss and granted a motion for change of venue, transferring the case to the Lamar Circuit Court. The parties proceeded with the discovery process.
On April 18, 1985, the remaining nine defendants (i.e., those other than Crawford Company) filed a motion for summary judgment "based upon the pleadings filed to date, the deposition of the plaintiff, James Cabaniss, and the applicable Alabama law." On May 7, 1985, the circuit court set defendants' summary judgment motion for hearing on June 4, 1985. On May 30, 1985, some six weeks after filing their motion for summary judgment, the defendants filed the affidavits of Matt McDaniel and defendant Ken Wilson. No certificate of service to opposing counsel was endorsed on either affidavit. The June 4 hearing on defendants' motion was held, at which plaintiffs' counsel failed to appear. Counsel for defendants orally moved to dismiss plaintiffs' complaint with prejudice under Rule 41(b) for failure to prosecute. The trial court granted the defendants' 41(b) motion and also their motion for summary judgment.[1]
Two weeks later, on June 19, 1985, plaintiffs filed a Rule 59(e) motion to reconsider and set aside the summary judgment, claiming, inter alia, that the June 4 hearing was inadvertently left off the calendar of plaintiffs' counsel, that discovery was not complete, and that genuine issues as to material facts still existed. Defendants filed a response to plaintiffs' motion to reconsider on June 25, 1985. The next day, June 26, plaintiffs amended their motion to reconsider to also request that the Rule 41(b) order be set aside. Plaintiffs also filed a reply to the defendants' response to their 59(e) motion and attached, among other things, affidavits of the plaintiffs' counsel's investigator, Larry R. Mann, in which Mann stated that he interviewed both Ken *Page 1180 
Wilson and Matt McDaniel and reduced their statements to writing, which each read and signed. These statements were attached to Mann's affidavits. By letter addressed to the circuit court dated July 8, 1985, defendants' counsel again responded to plaintiffs' request for post-judgment relief. On August 8, 1985, the trial court denied plaintiffs' motion to reconsider, as amended, and its order denying the motion was entered as a final order on August 13, 1985. This appeal followed.
Two issues are presented for review:
(1) Did the trial court err in granting defendants' Rule 41(b) motion for an involuntary dismissal of plaintiffs' complaint with prejudice for failure to prosecute?
(2) Did the trial court err in granting defendants' motion for summary judgment?
 I.
Plaintiffs contend that an involuntary dismissal with prejudice for failure to prosecute is a drastic measure and should be granted only when a plaintiff's conduct mandates such action. Plaintiffs argue that their conduct through counsel did not mandate a dismissal with prejudice.
The defendants, on the other hand, contend that when a plaintiff has been dilatory in prosecuting his claim, a dismissal for want of prosecution is within the discretion and inherent power of the trial court and should be reversed only for an abuse of discretion. The defendants argue that the plaintiffs' dilatory behavior is evidenced by: (1) the failure of plaintiffs' attorney to appear in court for the June 4 hearing and his failure to notify the court or opposing counsel that he would not appear; (2) the necessity of defense counsel's obtaining two prior discovery orders compelling plaintiffs to respond to interrogatories and requests for production filed by the defendants; and (3) the failure of plaintiffs to attempt to take any depositions of defendants from the time the complaint was filed on April 5, 1984, until after the motion for summary judgment was filed on April 18, 1985.
In Smith v. Wilcox County Board of Education,365 So.2d 659, 661-62 (Ala. 1978), this Court set forth the rules applicable to this Court's review of a dismissal for failure to prosecute:
 "The general rule, of course, is that a court has the inherent power to act sua sponte
to dismiss an action for want of prosecution. Link v. Wabash R. Co., 370 U.S. 626, 82 S.Ct. 1386, 8 L.Ed.2d 734 (1962). However, since dismissal with prejudice is a drastic sanction, it is to be applied only in extreme situations. Brown v. Thompson, 430 F.2d 1214
(5th Cir. 1970); Durham v. Florida East Coast Ry. Co., 385 F.2d 366 (5th Cir. 1967).
 "Therefore, appellate courts will carefully scrutinize such orders and occasionally will find it necessary to set them aside. 9 Wright Miller, Federal Practice Procedure, § 2370, p. 203, n. 1; see, e.g., Connolly v. Papachristid Shipping, Ltd., 504 F.2d 917
(5th Cir. 1974); Flaksa v. Little River Marine Construction Co., 389 F.2d 885 (5th Cir.) cert. den. 392 U.S. 928, 88 S.Ct. 2287, 20 L.Ed.2d 1387 (1968).
 "The Fifth Circuit Court of Appeals follows the rule that a trial judge may dismiss with prejudice an action 'only in the face of a clear record of delay or contumacious conduct by the plaintiff.' Durham v. Florida East Coast Ry. Co., supra, followed in Pond v. Braniff Airways, Inc., 453 F.2d 347 (5th Cir. 1972); Boazman v. Economics Laboratory, Inc., 537 F.2d 210 (5th Cir. 1976). Several other circuits follow that rule. See 9 Wright Miller, Federal Practice Procedure, § 2369, p. 194-95, n. 70. Other courts refer to a 'serious showing of willful default.' Gill v. Stolow, 240 F.2d 669 (2nd Cir. 1957); Dabney v. Burrell, 67 F.R.D. 132 (D.Md. 1975).
 "Consequently, it appears that the plaintiff's conduct must mandate the dismissal. Brown v. Thompson, supra.
. . . . . *Page 1181 
 "Finally, appellees argue that a lengthy period of inactivity may be sufficient to justify dismissal. First, as noted before, there was activity in this case preceding the dismissal; even where there has been a period of inactivity, present diligence has barred dismissal. Raab v. Taber Instrument Corp., 546 F.2d 522 (2d Cir. 1976); Moralos v. Lionel Corp., 439 F. Supp. 53 (S.D.N.Y. 1977); United States v. Myers, 38 F.R.D. 194
(N.D.Cal. 1964). Second, the rule is that a lengthy period of inactivity may justify dismissal in the circumstances of a particular case. Thus, a period of inactivity is generally coupled with some other act to warrant the severe penalty of dismissal. See, e.g., Link v. Wabash R. Co., supra (inactivity coupled with counsel's failure to appear at a pre-trial conference); Forest Nursery Co. v. Crete Carrier Corp., 319 F. Supp. 213 (E.D. Tenn. 1970) (failure of defendant to answer a summons 6 months after required by statute); Delta Theatres, Inc. v. Paramount Pictures, Inc., 398 F.2d 323 (5th Cir.) cert. den. 393 U.S. 1050, 89 S.Ct. 688, 21 L.Ed.2d 692 (1968) (failure to obey court order coupled with lapse of activity for 14 years)." (Emphasis in original.)
See also Selby v. Money, 403 So.2d 218 (Ala. 1981).
Applying the rule set forth in Smith, we hold that the facts of the present case do not justify dismissal with prejudice. First, the failure of the plaintiffs' attorney to appear in court on June 4 was allegedly inadvertent on his part. The defendants point to two recent cases, Neal v.American Telephone Telegraph Co., 454 So.2d 975 (Ala. 1984), cert. denied, 469 U.S. 1186, 105 S.Ct. 951,83 L.Ed.2d 959 (1985), and Blair v. Cooper,437 So.2d 1249 (Ala. 1983), as support for their position that the attorney's failure to attend the hearing on the motion for summary judgment is a sufficient basis for dismissal.Neal and Blair, however, are distinguishable in that, in each of those cases, the failure of the plaintiff or his attorney to attend a deposition was willful.
There does not appear to be any such willful conduct in this case.
Second, the plaintiffs' failure to respond to the discovery requests filed by the defendants, which resulted in orders to compel, was understandable, since the first discovery request was apparently filed by Crawford Company only, which had apparently received summary judgment some three weeks after the requests were filed on July 8, 1984. We know of no requirement that a party complete interrogatories once the party propounding them has been removed from the lawsuit. Indeed, on December 11, 1985, counsel for the defendants refiled the request for discovery on behalf of the remaining nine defendants, and even though the defendants had to resort to filing a subsequent motion to compel, the record shows that, early in the proceedings, plaintiffs themselves had to file a motion to compel the defendants to respond to interrogatories propounded by the plaintiff.
Third, the fact that the plaintiffs filed notice of taking the depositions of defendants prior to the hearing on the motion for summary judgment was sufficient to constitutepresent diligence and thus to bar dismissal. This is so especially in light of the facts that the lawsuit was just slightly more than a year old and that plaintiffs had engaged in discovery themselves by means of filing interrogatories.
Accordingly, we conclude that the trial court erred in granting the defendants' Rule 41(b) motion for an involuntary dismissal of plaintiffs' complaint with prejudice.
 II.
The next issue concerns the propriety of summary judgment in favor of the defendants. Before reaching the merits of this issue, however, we must determine at the outset what materials contained in the record were properly submitted for consideration by the trial court in ruling on the defendants' motion for summary judgment. More particularly, we are concerned with *Page 1182 
the affidavits of Matt McDaniel and Ken Wilson filed by the defendants on May 30, 1985, some six weeks after their motion for summary judgment had been filed and only five days prior to the hearing on the motion. We hold that, under these circumstances, these affidavits should not have been considered by the trial court in ruling on defendants' summary judgment motion.
 A.
Under Rule 6(d), A.R.Civ.P., set out in pertinent part below, any affidavits in support of a motion for summary judgment must be served with the motion:
 "When a motion is supported by affidavit, the affidavit shall be served with the motion. . . ."
Tardy affidavits are permissible under Rule 6(b)(2), but only when that rule is complied with.
 "Rule 6(b), which is a rule of general application, provides in part: 'When by these rules * * * an act is required or allowed to be done at or within a specified time, the court for cause shown may * * * upon motion made after the expiration of the specified period permit the act to be done where the failure to act was the result of excusable neglect * * *.' This passage gives the judge authority to accept a tardy affidavit when it is appropriate to do so." (Emphasis added.)
10A Wright, Miller Kane, Federal Practice andProcedure, Civil 2d, § 2719, "Proceedings for Summary Judgment," at 5-7 (1983). See also 2 C. Lyons, AlabamaRules of Civil Procedure Annotated, § 56.3, "Summary Judgment: Procedure on Motion," at 248 (1986).
In the present case, defendants did not make a motion under Rule 6(b) when the affidavits in question were filed, nor did they at that time refile their motion for summary judgment, which, when it was filed, was expressly "based upon the pleadings filed to date [April 8, 1985], the deposition of the plaintiff, James Cabaniss, and the applicable Alabama law." Furthermore, no certificate of service on opposing partiesappears on either affidavit. We, therefore, conclude that the affidavits of Matt McDaniel and Ken Wilson were not properly filed in support of defendants' motion for summary judgment, and, accordingly, this Court shall not consider them in reviewing the propriety of the trial court's order granting defendants' motion. Moreover, even if the affidavits had been properly filed, their contents do not suffice to establish the absence of a genuine issue of any material fact in this case. See discussion ante.
 B.
The standard of review applicable to motions for summary judgment is well settled: A motion for summary judgment may be granted only when there is no genuine issue of material fact and the movant is entitled to a judgment as a matter of law.Fountain v. Phillips, 404 So.2d 614, 618 (Ala. 1981). Furthermore, all reasonable doubts concerning a genuine issue of material fact must be resolved against the moving party.Couch v. Dothan-Houston County Airport Authority,Inc., 435 So.2d 14 (Ala. 1983). The movant's burden is markedly increased by the scintilla rule, which requires that summary judgment be denied if there is a scintilla of evidence, a mere gleam, glimmer, spark, or smallest trace, supporting the non-movant's position. Fountain v. Phillips, supra.
Moreover, in negligence and personal injury cases, where the facts constituting the conduct of the parties, as well asthe standard of care which they should have exercised are to be determined, the case is rarely appropriate for summary judgment. Hilburn v. Shirley, 437 So.2d 1252 (Ala. 1983); Bullen v. Roto Finishing Systems,435 So.2d 1256 (Ala. 1983).
Applying the law to the present case, it is quite clear that genuine issues of material fact remain. By their complaint, plaintiffs claim that these defendants negligently or wantonly breached their duty to provide plaintiff James Cabaniss a reasonably safe work environment, and negligently or wantonly controlled the conditions, methods, *Page 1183 
and manner in which the work was to be performed at the time and place of plaintiff's injury. In his deposition, plaintiff James Cabaniss explained that, on the evening of April 6, 1983, he had been working in the woodroom, which entailed running a conveyor system along which logs of various sizes traveled and were fed into a "chipper." Specifically, Mr. Cabaniss deposed as follows:
 "Q. Now, tell me what you were doing at the time you injured yourself on April the 6th, 1983.
 "A. I was training a fellow to run the woodroom, and I was working his job, utility.
"Q. And who was that fellow?
"A. Matthew McDaniel.
 "Q. Tell me what happened. Describe to me what happened and how you got hurt.
 "A. Just a chunk come down, and the utility person gets it. And when it came down, I just went out to throw it out.
"Q. How big was the chunk?
 "A. It was soaking wet, and I would say between 100 and 150 pounds, I guess.
". . . .
 "Q. What had you been doing for the first six hours of that shift?
"A. I had been operating the woodroom.
 "Q. Which means you were up in the operator's shack?
"A. Yes, sir.
 "Q. Running the conveyor belt; is that right, sir?
"A. Yes, sir.
"Q. And was Mr. McDaniel up there with you?
"A. Yes, sir.
 "Q. Is that where you were when this jam occurred?
"A. You talking about when I got hurt?
"Q. Yes, sir.
"A. It wasn't a jam, but that's where I was.
 "Q. What was it that caused you go to out there and try to remove this chunk if it wasn't a jam?
 "A. The reason that we got it before it was jammed was because if it had went any further, it would have been jammed.
 "Q. Can you tell me what conveyor beltline this was on?
"A. 178.
 "Q. And with reference to the beginning and the end of that particular conveyor, can you tell me where it was approximately?
 "A. Probably in the middle. Well, I know it was. It was in the middle on the edge.
"Q. And on which edge would that be?
"A. To the right side of it.
 "Q. If you are facing in which direction? Facing the end of it, it would be to your right?
"A. Yes, sir.
 "Q. And this chunk that you described as being wet and weighed 100 to 150 pounds; is that correct?
"A. Yes, sir.
"Q. How long was it, in your best judgment?
"A. Probably that long (indicating).
"Q. Three and a half feet?
"A. Three feet.
"Q. Okay. And how big around was it?
 "A. It was about, I guess, that big around (indicating).
 "Q. Can you give me an estimate of what you think the diameter of that would be — about three feet in diameter, too?
"A. Yeah.
 "Q. Now, tell me how you went about trying to remove the chunk.
 "A. First, I carried a pick with me. It was laying up on top of some logs, and I think I could pick the end of it up. I didn't have but, I'll say a foot and a half to pick it up, and I thought I could get it *Page 1184 
with a pick and just throw it on over, but I couldn't.
"Q. And why couldn't you do that?
"A. It was too heavy to do it like that.
"Q. Okay.
 "A. So then I just — I got down in there and picked up one end to roll it off, and it was wet, and it kept sliding back down on the end of the metal. And I couldn't do that, so I just had to pick it up and throw it out.
 "Q. And how did you pick it up? Did you put both hands, one on each end and just pick it up?
"A. Yes, sir.
 "Q. How long do you think you fooled with it by way of the pick and trying to pick up one end to roll it off before you bent over there to pick it up?
"A. Probably a minute.
"Q. Where was Mr. McDaniel at this time?
"A. He was still operating the woodroom.
 "Q. He was still in the operator's shack; is that correct?
"A. Yes, sir.
". . . .
 "Q. When you leaned over to pick this log up, what was it that caused you to hurt your back?
 "A. Just — I don't know what caused it. I just picked it up and threw it out.
 "Q. You just picked the chunk up and threw it out of the conveyor system?
 "A. Set it — picked it up and set it up on top and rolled it off.
"Q. Did your back start hurting you right then?
"A. Yes, sir.
 "Q. And you knew you had injured it right at that minute?
 "A. Wasn't any sharp pain or anything like that, but it started hurting."
Mr. Cabaniss admitted in his deposition that he had been given a safety manual by Weyerhaeuser Company, which he had read several times. He also admitted that he had been instructed as to lifting techniques for the apparent purpose of avoiding injuries, and that he had been told to get help if he thought a log was too heavy to lift by himself:
 "Q. [D]id you get any instructions about the proper way to lift from the supervisors before you got hurt on April the 6th?
"A. Yeah.
"Q. What instructions were you given?
 "A. Just if you lift something, use your legs. I don't really know.
"Q. You don't remember anything besides that?
"A. That if I needed help, get it.
 "Q. Is that the extent of your instructions that you received?
"A. Yes, sir, I guess."
However, Mr. Cabaniss explained that he did not ask for help when he was injured because he thought he could lift that particular log without help, and he especially did not want to ask for help that night because the work had been running slowly and they were short-handed. Mr. Cabaniss further deposed that defective equipment and the unavailability of equipment contributed to his injury; he deposed that the winch in the woodroom was nonoperational and that there was not a lift available at the conveyor above the woodroom for workers to use to remove larger pieces before they reached the chipper:
"Q. What caused the injury to your back?
"A. I don't know that.
 "Q. Well, sir, was there any defect in the equipment there that caused the injury?
 "A. Yeah. We didn't have any — we could have had something there to get it out with, but we didn't.
"Q. What?
 "A. Well, this one could have been got out with a lift before it ever got down to our end, it could have.
 "Q. Yes, sir. What other defect in the equipment was there, if any, which in your opinion contributed to your injury? *Page 1185 
 "A. Well, there was a winch there. But it didn't work.
"Q. How long had that been nonoperational?
 "A. When I first came over there, it worked, but it didn't work very long after I got there.
"Q. How long had that been out of commission?
"A. I'll say three years or longer, I know.
 "Q. During that three-year period of time, you were the woodroom operator; is that right?
"A. No, sir.
"Q. Where were you? What was your job?
"A. Utility and woodroom operator.
 "Q. Okay. And as a utility man and as a woodroom operator, did you ever have occasion to go out on that conveyor where the winch was that wasn't working and remove any chunks of any kind?
"A. Sure.
 "Q. And you did that by hand; is that right, sir?
"A. Yes.
 "Q. Did you ever have any occasion during that period of time when the winch wasn't working where you had to get somebody to help you do that?
"A. Sure.
 "Q. And what was the procedure to get somebody to help you?
"A. Just ask somebody to help you.
 "Q. And they would come over and do it; is that right, sir?
"A. Uh-huh.
 "Q. Did you ask somebody to help you on this occasion?
"A. No, sir.
"Q. Why not?
 "A. Because we had had a bad night, and we wasn't running too good, and we was trying to keep everything running. Anybody that always goes out there if they think they can do it, they don't ask for help.
 "Q. So you made the conscious decision not to ask for any help; is that right?
"A. Yes, sir.
 "Q. And that was because you were concerned over low production on that particular shift?
"A. Yes, sir.
"Q. Are you paid by the hour?
"A. Yes, sir.
 "Q. So whether the plant produced or not, you still got paid; is that right, sir?
"A. Yes, sir.
 "Q. What I am getting at is, your pay wasn't tied to the amount of production that came through?
"A. No, sir.
 "Q. Besides the winch and the lockout buttons that you have described that weren't working, is there any other equipment which was not working or defective in any way which contributed to, in your opinion, your accident?
 "A. Not other than it was not got out before it got there. I don't guess there is anything else.
 "Q. Whose job would that have been to get it out before it got there?
 "A. If the mercher operator — the one that cut it — had seen it, he could have stopped it and called a lift.
"Q. Who was the mercher operator on that shift?
"A. Tommy Gilliam.
". . . .
 "Q. Okay. Now, is that all of the three mechanical things that were wrong that, in your opinion, contributed to your accident or is there anything else; and if so, please tell me.
"A. I think we were short-handed that night.
"Q. How many hands were you short?
"A. I can't say.
 "Q. Who was there that you thought should have been there?
"A. Who was there that I — *Page 1186 
 "Q. Who was not there? I'm sorry. I misphrased that. Who was not there that should have been?
 "A. Well, Junior Burkhalter. He's the one that usually worked with me, and I don't remember if he wasn't there or if he was somewhere else or what.
"Q. Anybody else?
"A. Not that I can think of."
Defendants argue that, because it is undisputed that Mr. Cabaniss did not request help from fellow workers to lift the log but injured his back lifting it alone, Mr. Cabaniss failed to follow the safety procedures given to him by the defendants at Weyerhaeuser Company. Thus, defendants implicitly
contend that, by giving Mr. Cabaniss the instructions on lifting, admittedly received by Mr. Cabaniss, the defendants met their duty to provide him a safe working environment, and that these instructions were proper and safe procedures for lifting. Defendants therefore contend that, by failing to follow these instructions, Mr. Cabaniss caused his own injury. However, there is no evidence whatsoever in the record establishing that the lifting instructions given to Mr. Cabaniss by the defendants were, in fact, proper and safe under the circumstances of Mr. Cabaniss's employment. Therefore, a genuine issue of fact remains, and this Court cannot say that defendants were entitled to a judgment as a matter of law.
On the state of this record, it is clear that a genuine issue exists as to whether the defendants' safety procedures were, in fact, reasonably safe, i.e., was it reasonable to instruct Mr. Cabaniss to get help from co-workers if hethought something was too heavy for him to lift alone? Mr. Cabaniss deposed, in effect, that he could not determine the weight of a given log by looking at it. He further deposed that a winch was located in the woodroom, but that it was inoperable. These facts, which were not refuted by the defendants on summary judgment, give rise to several questions: If getting help from co-workers was a proper and safe procedure to follow to avoid lifting injuries, why was a winch provided at all? Was Mr. Cabaniss instructed on how to predetermine that a given log or piece of wood was too heavy for him to lift alone? Was Mr. Cabaniss assisted by the defendants in determining the weight that he could safely lift alone without injury? Indeed, without knowing how much one could lift, or how much a given log weighed, it is entirely conceivable that one would not know he needed help until he had already injured himself trying to lift it alone. Suppose Mr. Cabaniss had asked for and gotten help, but was still injured? Would defendants argue that he failed to follow procedure by not askingenough other workers to help him? Clearly, genuine issues of material fact exist with respect to whether the defendants were negligent or wanton in carrying out their duty to provide Mr. Cabaniss with a reasonably safe working environment by instructing him to get help when he thought he could not lift a log and by failing to repair the woodroom winch or provide other mechanical means for lifting the logs.
Defendants cite several cases as authority for their position that they did not breach their duty to Mr. Cabaniss; however,none of these cases was disposed of by summary judgment: George v. Alabama Power Co., 402 So.2d 939
(Ala. 1981) (directed verdict at the close of plaintiff's case where plaintiff, who contended that Alabama Power Company had failed to provide an adequate work force, conceded attrial that the safest way to "shake out the rails" was to work in pairs, but plaintiff did not order any of the other iron workers to help him shake out the rails, although he had the authority to do so); Seaboard Coast Line R.R. v.McDaniel, 56 Ala. App. 322, 321 So.2d 664, cert.denied, 295 Ala. 416, 321 So.2d 670 (1975) (judgment on jury verdict); Seymour v. Holman, 229 Ala. 634,158 So. 525 (1934) (judgment for defendant on jury verdict). However, in the present case, defendants failed to meet their burden of proving that there are no genuine issues of material fact regarding *Page 1187 
the liability of the defendants for plaintiff James Cabaniss's injuries.
Additionally, defendants contend that there is not a scintilla of evidence that these defendants had the duty to provide plaintiff James Cabaniss a reasonably safe working environment. To the contrary, plaintiffs alleged in their complaint that these defendants had such a duty, and the defendants have submitted no evidence establishing that they did not, in fact, have that duty. It bears repeating that it is the movant's burden on motion for summary judgment to refute, by competent evidence, any and all allegations of plaintiffs' complaint and thereby establish that there is no genuine issue of any material fact and that the movant is entitled to a judgment as a matter of law. Braswell WoodCo. v. Fussell, 474 So.2d 67 (Ala. 1985); Couch v.Dothan-Houston County Airport Authority, Inc., supra. This the defendants have not done. Based on the foregoing, we hold that summary judgment was not proper in this case.
The judgment below is due to be, and it is hereby, reversed and the case remanded for further proceedings.
REVERSED AND REMANDED.
TORBERT, C.J., and MADDOX, JONES, SHORES, ADAMS, HOUSTON and STEAGALL, JJ., concur.
[1] We note the peculiarity of the trial court's dismissal of plaintiffs' case with prejudice in addition to its decision on the merits by granting summary judgment for defendants.